IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANNETTE MARTINEZ,

       Plaintiff,

vs.                                  No.  05cv0956 DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's (Martinez') Motion to Reverse or Remand Administrative Agency Decision **[Doc. No. 8]**, filed March 6, 2006, and fully briefed on April 19, 2006.  On July 16, 2004, the Commissioner of Social Security issued a final decision denying Martinez' claim for disability insurance benefits.  Martinez seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to remand is well taken and will be GRANTED.

### I.  Factual and Procedural Background

Martinez, now thirty-nine years old (D.O.B. April 1, 1967), filed her application for disability insurance benefits on March 11, 2003 (Tr. 15), alleging disability since March 25, 1998 (Tr. 336), due to multiple sclerosis and anxiety.  *Id.*  Martinez' insured status expired on December 31, 2001. Tr. 236-241.  Therefore, she had to show that she was totally disabled prior to that date.  *See Henrie v. United States Dep't of Health and Human Servs.*, 13 F.3d 359, 360 (10th Cir. 1993). Martinez

has a high school education and past relevant work as a production operator, hostess, and salesclerk. On July 16, 2004, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding Martinez was not disabled as she retained the residual functional capacity (RFC) to perform a wide range of light work with "only occasional balancing, stooping, and crouching and only occasional pushing and pulling with her lower extremities."   Tr. 18.   The ALJ found Martinez' "multiple sclerosis was 'severe' within the meaning of the Regulations but not 'severe' enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."  Tr. 17.   The ALJ further found Martinez' "reports of pain and functional restrictions were not supported by the evidence overall in the disabling degree alleged and therefore lacked credibility."  *Id.*  Martinez filed a Request for Review of the decision by the Appeals Council.  On July 9, 2005, the Appeals Council denied Martinez' request for review of the ALJ's decision.  Tr. 6.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Martinez seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards. *Hamilton v. Secretary of Health and Human Servs.,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments

severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse and remand, Martinez makes the following arguments: (1) the ALJ erred in finding she did not meet Listing 11.09; (2) the ALJ erred in failing to give controlling weight to her treating neurologist's opinion; and (3) the ALJ erred in mechanically applying the Medical-Vocational Guidelines (the grids) despite the presence of significant non-exertional impairments.

**A.  Relevant Medical Records**

On February 9, 1995, Emmet Thorpe, M.D., a physician with the Occupational Medicine Department of Lovelace Health Systems, evaluated Martinez for complaints of chronic knee pain. Tr. 146.  Dr. Thorpe advised Martinez to continue working and to continue her exercises.  Dr. Thorpe also recommended extra-strength acetaminophen "occasionally." *Id.*

On May 15, 1995, Martinez complained of acute redness and soreness of the right eye.  Tr. 160.  Dr. Anderson diagnosed Martinez with conjunctivitis, dry eyes, and over use of contact lenses. *Id*.  Dr. Anderson prescribed Tobradex eye drops.

On May 19, 1995, Martinez returned for a follow-up with Dr. Anderson.  Tr. 161.  Dr. Anderson noted the conjunctivitis had resolved and recommended Martinez use her glasses and continue the eye drops.

On August 10, 1995, Martinez returned to see Dr. Anderson.  Tr. 162.  Martinez informed

Dr. Anderson that she had not taken the drops prescribed for the conjunctivitis as he had directed.

Martinez explained that she couldn't take the drops because they interfered with her use of her

contact lenses.  According to Martinez, she needed her contact lenses because she was very busy and

worked twelve hour shifts.  Martinez complained of redness and blurred vision.  Dr. Anderson

diagnosed Martinez with dry eyes.  Dr. Anderson discontinued the Tobradex eye drops and

prescribed rewetting drops three times a day.

On January 16, 1996, Dr. Gorvetzian, a physician in the Internal Medicine Department at

Lovelace Health Systems, ordered an MRI of the brain.  Tr. 179-180.  The findings indicated

"extensive signal abnormalities, consistent with progression of multiple sclerosis since 5-7-92."  Tr.

180.

On January 25, 1996, Dr. Suter evaluated Martinez.  Tr. 129-130.  **Martinez had not been**

**seen at the Neurology Clinic since January 1994**.  In the interval, "she ha[d] been quiescent."

Tr. 129.  "**[H]er last actual documented definite MS episode was in 1992**."  *Id.*  In the past,

Martinez had reported "episodes involving both spinal symptomatology with hemisensory numbness,

clumsiness, worse in the left leg" and "a remote episode of optic neuritis."  *Id.*  Dr. Suter noted there

had been several visits in 1993 for "symptoms" which Dr. Suter opined "reflected more anxiety and

somatic complaints, with dizziness and some other phenomenon, but, with nothing to really suggest

a true MS attack."  *Id.*  Dr. Suter further noted "**complaints of fatigue all along, which can be a**

**common MS problem**."  *Id.*

Dr. Suter noted Martinez **continued to work at Sandia** and had "**been truly symptom-**

**free" since she saw Martinez in 1994**.  Martinez was complaining of blurred vision.  Dr. Suter

noted the episode was "no where near as severe as her episode two to three years ago, when she had fairly significant visual loss, worse in the right eye." *Id.* This time the symptoms were worse in the left eye but were 80-90% improved. Dr. Suter opined that "**overall, things were stable**" and that Martinez had "probably had a **mild episode of optic neuritis**" which had "**resolved quite dramatically**." *Id.* **Dr. Suter found no need to propose any treatment**. Dr. Suter asked Martinez to return in four to five months. If Martinez started having MS recurrences closer together than every two years, Dr. Suter advised discussing Betaseron and other medication for reducing attack frequency. Tr. 130.

On February 8, 1996, Dr. Suter ordered a visual evoked response (VER) test. Tr. 183. The VER report indicated the study was consistent with the effects of demyelinative process bilaterally, most notable in the left eye. *Id.* Dr. Suter also noted Martinez' multiple sclerosis had been stable since 1994. Martinez had reported an episode of "blurred vision" 4-5 weeks prior to the VER test but was **already 80-90% improved at the time of the study**. Dr. Suter found "an abnormal study bilaterally." *Id.*

On February 17, 1996, Angelica Caglia, M.D., evaluated Martinez for complaints of dizziness. Tr. 127-128. Martinez told Dr. Caglia that she did not believe she had MS. Tr. 127. Dr. Caglia prescribed Antivert 12.5 mg for the dizziness and switched her from Buspar to Prozac for her depression. Tr. 128. Dr. Caglia referred Martinez to Dr. Suter.

On February 21, 1996, Dr. Gorvetzian evaluated Martinez. Tr. 125-126. Martinez reported seeing Dr. Caglis in the Saturday Clinic the previous week. Martinez complained of dizziness for one week. Martinez complained of walking into walls and doors due to the dizziness. The physical examination indicated nystagmus bilaterally. Dr. Gorvetzian assessed Martinez with possible middle

ear infection or labrynthitis but was also concerned that she may be having an exacerbation of her MS.  Dr. Gorvetzian informed Martinez that he would discuss her case with Dr. Suter.

On March 1, 1996, Martinez had an ENG performed.  Tr. 153.  The results were "very abnormal, suggesting central pathology . . . ."  *Id.*

On April 8, 1996, Martinez returned for a follow-up visit with Dr. Grovetzian.  Tr. 123-124.  Martinez was still complaining of dizziness.  The ENG indicated "some evidence of peripheral disease as well as central disease."  Tr. 123.  Martinez informed Dr. Goretzian that she was taking Prozac for her depression but it was not helping her.  Martinez also stated that "several doctors had told her that she was depressed, but she [did] not really think she was."  *Id.*  The physical examination was essentially normal with no nystagmus.  Dr. Goretzian assessed Martinez with "persistent dizziness, perhaps slightly improved, ? related with multiple sclerosis with vestibular dysfunction" and "question of depression."  Tr. 124.  Dr. Goretzian prescribed head exercises for her dizziness, directed her to stop the Prozac, take Advil for her myalgias, and return in three weeks.

On April 19, 1996, Dr. Rothberg evaluated Martinez for complaints of dizziness and blurred vision.  Tr. 163.  Martinez also reported losing her balance when getting up.  Dr. Rothberg assessed Martinez with "nystagmus on lateral gaze– may be contributing to dizziness" and "history of MS, optic neuritis."  *Id.*  Dr. Rothberg noted Martinez had a scheduled appointment with Dr. Suter.

On April 29, 1996, Martinez returned for her follow-up with Dr. Gorvetzian.  Tr. 121-122.  Martinez continued experiencing dizziness and unsteadiness.  Tr. 121.  Martinez reported she had stopped taking the Prozac because she felt her mood was getting worse.  *Id.*  The neurological examination indicated Martinez leaned backward during the Romberg test and was "able to walk along a straight line for about 10 feet, but then felt a little unsteady and had some difficulty after that

point." *Id.*  Dr. Gorvetzian diagnosed Martinez with "persistent symptoms of dizziness and

unsteadiness, rule out secondary to multiple sclerosis, rule out inner ear dysfunction" and depression.

*Id.*  Dr. Gorvetzian also noted, "I will have her follow-up in ENT Clinic for evaluation of her ENG,

and also I will ask her to see Dr. Suter this month sometime."  Tr. 122.

On May 9, 1996, David Neal, M.D., a physician at the ENT Clinic, evaluated Martinez at Dr.

Gorvetzian's request.  Tr. 120.  Dr. Neal noted Martinez' ENG showed "an absence of calorics, both

to hot or cold water in her left ear" and  "was abnormal in the eye tracking and central areas."  *Id.*

The physical examination showed no nystagumus.  Dr. Neal ruled out acoustic neuroma.  Dr. Neal

prescribed Meclizine for her dizziness.  *Id.*

On May 9, 1996, Dr. Suter also evaluated Martinez.  Tr. 118-119.  Dr. Suter noted:

> Annette returns for follow-up:  Last seen in January 1996.  After several quiescent years, she
> has had an episode of distinct optic neuritis earlier this year with abnormalities on visual
> evoked response symptoms to the left optic nerve and abnormalities on visual evoked response
> testing, referable to the left optic nerve.  Years ago, she had a similar episode involving the
> right eye and indeed those abnormalities were improved on these more recent visual evoked
> response tests.  By my history, her last definite episode was some time in 1992.
>
> She has also had problems with vague symptoms that I think often might represent anxiety and
> just somatic symptoms, including vague symptoms of dizziness, etc.  Again, this year, other
> than the distinct optic neuritis she has had some problems with dizziness of a waxing and
> waning nature.  She had had an ENG study which has shown abnormalities that might suggest
> a peripheral labyrinthine disorder but unfortunately she also has central nervous system
> abnormalities.  So, it is very likely that she could have dizziness of either origin.  Either way,
> it is obvious that she has had one definite recurrent episode in regards to the optic neuritis.
>
> If she continues to have recurrent episodes in the next eighteen months of a definite nature,
> this would put her back into a category to consider treatment with betaseron injections.  She
> and I have previously discussed but not opted for this treatment as she was remaining
> symptom-free.
>
> Otherwise, in discussion(sic) the situation with Annette and her mother today, I can only
> emphasize the need for us to be accurate in our identification of "MS attacks" and to not be
> ascribing **vague somatic symptoms** to multiple sclerosis unless we are certain.  Over the
> years, dizziness may be one of the more challenging symptoms, as she seems to have a
> combined potential for dizziness of either peripheral or central origin based on studies

8

performed.  Therefore, <u>dizziness alone without other central nervous system symptoms should be approached cautiously before diagnosed as definitely multiple sclerosis in origin</u>.

For now, we will continue to <u>follow her at 4-6 month intervals and prn</u>, as needed.

I do think she might want to keep a prescription for Antivert/meclizine on hand to the extent that if she gets <u>recurring problems with **mild** dizziness of a nondescript nature</u>, it certainly could not hurt to try implementing the Antivert immediately recognizing that Antivert prescribed late into one of her dizzy spells was of no great benefit, I still think it would be at least valuable to have it available for prn use and I have written her a prescription for this purpose.

Tr. 118-119 (emphasis added).

On May 20, 1996, Dr. Anderson evaluated Martinez for complaints of dizziness and "walking crooked."  Tr. 164.  Martinez reported having these symptoms for one month.  Dr. Anderson reassured Martinez.

On July 8, 1996, Martinez returned for a follow-up visit with Dr. Gorvetzian.  Tr. 116-117. Dr. Gorvetzian noted Martinez "had persistent symptoms over the past few months of dizziness." Tr. 116.  Martinez also complained of migraine headaches and of having a feeling of tingling in her right thigh.  Martinez was not taking any medications at all except for Fiornal.  Martinez had been instructed to take the Fiornal four times a day but was not taking it as prescribed because it was "not making much difference."  *Id.*  Dr. Gorvetzian diagnosed Martinez with "complaints of chronic dizziness of uncertain etiology," headaches, and history of multiple sclerosis.  Tr. 117.  Dr. Gorvetzian prescribed Nadolol 20 mg for her headaches and noted her "problems seem to be more chronic and not responding to usual measures."  *Id.*

On July 9, 1996, Martinez went to the Lovelace Health Systems Medical Clinic to learn how to self inject DHE-45 IM for her headaches.  Tr. 114.  Martinez received a prescription for DHE-45 and supplies.

On August 7, 1996, returned to Dr. Gorvetzian for her follow-up. Tr. 112-113. Dr. Gorvetzian noted Martinez had been having some problems with chronic dizziness and headaches. Martinez reported the DHE-45 had not helped her headaches. Tr. 112. Martinez also reported she had not been taking the Nadolol because she was not sure what it was for. *Id.* Dr. Gorvetzian assessed Martinez with "persistent dizziness, possibly multifactorial," headaches, multiple sclerosis, and history of MVA in June, 1989 with residual back pain." Tr. 112-113. Dr. Gorvetzian recommended Martinez take the Nadolol on daily basis for her headaches. Significantly, Dr. Gorvetzian recommended Martinez return to work, noting:

> I also discussed with her going back to work and I think she is improved over the past few months and she does agree. I told her that giving her something more to do might be beneficial for her in keeping her mind occupied and hopefully then her other symptoms may be less of a bother to her. She tells me that there have been some layoffs at Motorola but that she thinks she would be able to go back to work toward the end of the next month and has been talking with the personnel department there. I think this is a reasonable thing and again I told her I think it would be very good for her to be occupied back at work and we will plan on this.

Tr. 113 (emphasis added). Dr. Gorvetzian directed her to return in two months.

On October 10, 1996, Dr. Suter evaluated Martinez. Tr. 110-111. Martinez was there for her 5-6 month follow-up. Dr. Suter noted Martinez had had an episode of blurred vision in January but, "although not severe did seem typical for an episode of optic neuritis but not nearly as severe as her episode of optic neuritis occurring in 1992." Tr. 110. Notably, Dr. Suter opined that "**other than this one episode [Martinez] had remained free of any symptoms to suggest an acute attack**." *Id.* However, Dr. Suter also noted Martinez did "**maintain some chronic residual problems from her MS, specifically in regards to clumsiness and numbness in the lower extremities– presently in the right leg**." *Id.* Dr. Suter noted these symptoms were "**present constantly and increased with exertion activity, etc**." *Id.* Dr. Suter further noted:

10

She also continues with chronic "dizziness" that does have a definite positional component. She has not been able to improve on this with exercises for labyrinthine disorders. She has not responded to Meclizine. She has had an abnormal audiogram and <u>ENG in March that suggested not only central but significant left peripheral abnormalities.</u>

She continues to have intermittent migraine type headaches that are predominantly unilateral, most often right hemicranial and she also has chronic low grade daily tension type headaches for which she takes nothing most of the time.

She also continues to have daily "panic attacks." These are brief. Many of her symptoms sound almost like costochondritis in that she gets a sharp pain in the sternum or mid chest, but she also gets an uncomfortable anxious feeling with this. She does not like to take medication. She was given Prozac by Dr. Gorvetzian; as best as I can understand it actually helped for a while. She discontinued the Prozac and the panic attacks have begun to come back. I have encouraged her to go back on the Prozac as per Dr. Gorvetzian's original prescription.

On exam today Romberg testing is <u>mildly positive</u>, gait and station are independent with no severe ataxia.

She continues to have hyperreflexia in the lower extremities, but no clonus. Coordination is normal in the upper extremities. There is no nystagmus. Pupils are 3mm and equally reactive to light.

When standing she can bend forward bringing on a sense of dizziness but without falling. When she straightens back up this further aggravates the symptoms, but again without nausea, vomiting, or falling.

IMPRESSION: Annette continues to suffer from the same mixture of chronic complaints. <u>Some of her dizziness I think is as much peripheral as central but more importantly has now become a chronic problem over the last year.</u>

She reports that she believes she has been on Ativan/Lorazepam in the past but perhaps for anxiety attacks and not for dizziness. I am not sure we have any real treatment that is likely to help her chronic complaints. She has not responded to Meclizine. First, I would encourage her to get back on the Prozac as this seemed to benefit her panic attacks and then if she would like a further treatment trial we could try her on a very low dose of Ativan for dizziness and if it was not beneficial she would not bother refilling the prescription.

<u>More importantly would seem that she really is stable and not having a prominent relapsing/remitting course that would warrant treatment with Avonex or Betaseron injection therapy.</u>

I will see Annette back for follow-up in 5-6 months. She would consider reassessing some of her baseline tests including an audiogram and ENG next year and perhaps MRI scanning with attention to the brain stem. <u>It is of note that she has had brain stem auditory evoked responses in the past that had been repeatedly normal.</u>

11

Tr. 111-112 (emphasis added).

On January 30, 1997, Martinez returned for a follow-up with Dr. Gorvetzian.  Tr. 187-188.

Dr. Gorvetzian noted Martinez had a "history of multiple sclerosis and **chronic problems with**

**vertigo and dizziness**" and was monitored by Dr. Suter.  Tr. 187.  Martinez reported "doing

reasonably well" as far as her multiple sclerosis but **complained of dizziness "on a fairly regular**

**basis**." *Id.*

Martinez had been involved in a motor vehicle accident and was complaining of pain in her

left chest and rib cage area.  Dr. Gorvetizian confronted Martinez regarding the falsification of her

prescriptions for Percocet and Soma.  The prescriptions were written for 30 tablets each.  However,

the prescription had been altered to read 80 tablets.  Dr. Gorvetizian informed Martinez that he

would have to report the alteration to the New Mexico Board of Pharmacy.  Tr. 188.  Dr.

Gorvetizian prescribed a heating pad and Advil for the chest and rib cage pain.

On June 30, 1997, Dr. Suter evaluated Martinez.  Tr. 215-216.  Dr. Suter noted **he had not**

**seen Martinez since October 1996**.  Martinez reported "no major episodes that would seem typical

for a true 'MS attack.'"  Tr. 215.  Dr. Suter performed an examination, finding, in pertinent part, as

follows:

> Neurologic:  Speech is normal.  <u>Gait and station is, if anything, improved, and indeed she
> would claim that subjectively her chronic vertigo is somewhat less symptomatic this month.</u>
> There is some wobbling on Romberg testing, and she occasionally steps off of line on tandem
> gait testing, but if anything <u>her ataxia is improved, not worsened</u>.
> Lying down, heel-to-shin and finger-nose-finger testing is normal.
>
> Visual acuity with her contact lenses is 20/25 in the right eye and 20/30 in the left eye.  There
> are no visual field defects to confrontation.
>
> <u>Motor strength appears intact</u>.  Although she complains of sense of dragging of the right lower
> extremity more than the left, <u>there is no prominent limp, upper motor neuron or  lower motor</u>

neuron type gait involving either leg today that I can see in clinic, and she does admit that this is sometimes worse at the end of the day when she is tired.

IMPRESSION: Overall, this would appear to be a stable exam, in a patient who has more problems with anxiety and chronic vertigo of multiple etiologies, but does have well established multiple sclerosis with abnormalities on visual evoked response testing in the past and MRI scanning. However, at the present time, her multiple sclerosis would appear to be reasonably quiescent and stable in it's course. We have again discussed Avonex, Betaseron and the more newly approved copolymer products, all of which involve some sort of fairly frequent injection, and do not seem advisable at this point.

Tr. 216. Dr. Suter also noted Martinez' insomnia was "most likely part and parcel of her overall underlying generalized anxiety disorder." Id.

On July 31, 1997, a speech pathologist performed an audiogram and ENG on Martinez.

Tr. 214. The speech pathologist noted:

FINDINGS: Hearing remains excellent bilaterally. Tympanograms remained normal. Acoustic reflexes were present ipsilaterally, but absent contralaterally, which may again go along with central pathology.

Responses to the ENG were much improved over last years' ENG. Ms. Martinez was able to do the visual tasks with much better accuracy. Saccades and visual tracking were normal this time. OPK testing was still asymmetric and stronger to the left; however, Ms. Martinez was able to do the task somewhat to the right this time, whereas she was unable to do so last year.

Again no nystagmus was noted with eyes open nor eyes closed in either supine, midline, or positional situations.

Responses to caloric irrigations were still abnormal, weak bilaterally. There was a response at intervals to both ears this time which was more symmetric. However, the nystagmus was not sustained throughout the duration of the task, which is an abnormal finding and more central than peripheral.

In summary, hearing remains excellent with much improved ENG findings.

Id.

On August 4, 1997, Sara Pasqualoni, M.D., an internist with Lovelace Health Systems, evaluated Martinez. Tr. 212-213. Martinez was there to "establish care." Tr. 212. Martinez reported she was **not taking any medications**. Martinez' primary issue was her inability to

13

conceive.  Martinez also reported she had **not suffered "any acute symptomatic episode in quite some time**." *Id.*  Notably, Dr. Pasqualoni assessed Martinez' **chronic vertigo as stable**. Tr. 213.  Dr. Pasqualoni noted the **multiple sclerosis was stable**. *Id.*

On August 28, 1997, Martinez saw Dr. Pasqualoni for a lump in her right breast.  Tr. 208-209.  In regards to her multiple sclerosis, Dr. Pasqualoni noted, "**patient without any acute symptomatic episode in quite some time**.  **The patient is followed in neurology, and is on no medical therapy at this time**."  Tr. 208.  Martinez reported increased fighting with her boyfriend with "more frequent anxiety attacks in the past couple of weeks."  *Id.*  Dr. Pasqualoni referred Martinez for a mammogram.  Tr. 209.

On September 15, 1997, Martinez returned for a follow-up with Dr. Pasqualoni.  Tr. 210. Martinez was in to have her breast lump evaluated.  Dr. Pasqualoni referred Martinez for a biopsy.  On this day, Dr. Pasqualoni noted Martinez' **vertigo was stable and her multiple sclerosis also was stable**.

On October 16, 1997, Dr. Suter submitted a "To Whom It May Concern" letter confirming Martinez had been followed at Lovelace Medical Center for a "diagnosis of multiple sclerosis with symptoms beginning as far back as 1981" and also suffered from "migraine headaches and chronic recurring vertigo of both peripheral and central origin."  Tr. 217.

On October 19, 2001, Robert M. Shannon, M.D., evaluated Martinez.  Tr. 328-330 & 312-314 (duplicate copy).  Dr. Shannon assessed Martinez with MS, depression, and acne vulgaris.  Dr. Shannon's impression was "**multiple sclerosis with eye and other peripheral nerve damage issues with intermittent gait instability and chronic weakness on right side**." Tr. 329.  As to her depression, Dr. Shannon noted, "sleeps well at night at the present time and

**has very little trouble with her depression**." Tr. 328. Under his "objective" findings for multiple sclerosis, Dr. Shannon noted Dr. Rothberg saw Martinez for her "eye issue" but her vision had returned. *Id.* Dr. Suter monitored Martinez for "balance issues and weakness." *Id.* Dr. Shannon also noted Martinez was **not on any medication for her MS** and had a **"very normal" gait**. *Id.*

On May 20, 2002, Dr. Suter, evaluated Martinez. Tr. 323-325 & 307-309 (duplicate copy). Dr. Suter noted the visit took "30 minutes of which greater than 50% was spent in counseling and discussion." Tr. 325. Dr. Suter noted Martinez was taking Paxil for the depression and Fiorinal, as needed for her migraine. Significantly, Dr. Suter noted:

> Annette returns for follow up again as always <u>still living out of state</u> because her husband is stationed out of state with a company that is based in Albuquerque. They are in Las Vegas, Nevada. She is back as she usually is for about one or two weeks to stay here in town with family and take care of medical care visits. She has appointments later this week in primary care and in the eye clinic. She has not yet established a referral or appointments in the fertility clinic, which would require, I believe, wanting to hold off on immune modulating shots for her MS as long as possible.
>
> <u>Annette confirms since I last saw her on October 8th that there have been no major MS attacks or relapses.</u> She still has problems with balance and coordination and a sense of numbness in the lower extremities. <u>But there have been no acute exacerbations requiring treatment with steroids</u>, etc.
>
>                 ** ** ** ** ** ** **
>
> EXAMINATION: Reflexes remain somewhat brisk in the lower extremities and more so on the right than the left. There is no foot drop or reflex deficit of the lower motor neuron type on the right compared relative to her disc protrusion.
>
> <u>Her stance is moderately wide based as it has always been, but not worsened.</u> Romberg testing can only be performed standing with the feet about 12 inches apart, not on the normal narrow base. Tandem gait is wobbly but baseline.
>
> IMPRESSION: <u>I would agree that Annette clinically and subjectively appears stable in regard to her MS.</u> But I have advised her that the longer she and her husband have trouble with her becoming pregnant, the time may come with either an acute attack or significant changes on brain MRI imaging where we are forced to place her on an immune modulating shot, which she would then have to discontinue if she became pregnant.

We have acknowledged the last MRI October 5 and no need to repeat an MRI until the end of this year. We will see if we can make arrangements six or seven months ahead of time for a brain MRI on a Friday or Monday in November and a follow up visit with me over a noon break on a Tuesday to be sure that it is not interfered with by the neurology call schedule, which has not yet been determined that far out.

Tr. 323-324. Dr. Suter also found Martinez was "**getting along presently with her sciatica**"

**and "[h]er migraine [was] reasonably stable**." Tr. 323, 324.

On June 29, 2002, Dr. Suter ordered an MRI of the brain. Tr. 326-327 & 310-311

(duplicate copy). The MRI results were compared to an earlier MRI done on October 5, 2001.

The MRI indicated the following:

| | | |
|---|---|---|
| IMPRESSION: | 1. | Extensive predominantly periventricular white matter changes as above consistent with multiple sclerosis. These changes are relatively stable from previous exam of 10-5-01. |
| | 2. | Previous exam demonstrated an enhancing lesion involving left frontal subcortical white matter. This lesion no longer demonstrates enhancement and does appear smaller on T2 sequences. |
| | 3. | There is associated atrophy of the corpus collosum as well as some prominence of extra-axial CSF spaces. |
| | 4. | Multiple relatively small cerebellar lesions are noted and are without significant change. |
| | 5. | Incidental right maxillary sinus mucous retention cyst. |

Tr. 327(emphasis added).

On December 11, 2002, Martinez returned for her follow up with Dr. Suter. Tr. 321-322

& 305-306 (duplicate copy). Dr. Suter diagnosed Martinez with "1) **multiple sclerosis–**

**presently stable and quiescent**; 2) history of migraine headache syndrome and chronic

headaches; 3) **history of right L5-S1 disk herniation** with episode of acute sciatica/responding

to epidural injection– **stable**; and 4) history of depression. Tr. 321. Dr. Suter reported the June

2002 MRI showed no significant changes. Martinez reported she was **still living with her**

16

**significant other in Las Vegas, Nevada**.  Martinez also reported she could not get health

coverage through him because they were not married.  Dr. Suter noted,

> She has recently been going through some issues in regards to having to switch over to Social
> Security and this has had her back in Albuquerque for longer than her usual stay.  She reports
> to me on this visit that as before there have been no acute exacerbations/relapses in regard to
> her multiple sclerosis.  At the time of her diagnosis and for several years afterwards, her
> multiple sclerosis attacks involved spinal cord events and optic nerve function.  The patient
> presents to this visit alert and oriented.  There are not and have never been any cognitive
> effects from the multiple sclerosis.

> OBJECTIVE:  She shows no cerebellar abnormalities seated in regards to upper extremities.
> She has **mild** abnormalities on Romberg and tandem gait testing.  She maintains hyperreflexia
> more notable in the lower extremities than the upper and more so  on the right than the left.
> There is slight increased tone but not prominent spasticity.  There are only a few beats of
> clonus at the ankles, none sustained.

> IMPRESSION:  Continued clinically stable multiple sclerosis.

> PLAN:  The patient and her significant other are still planning marriage and a family.  They
> are actually going to be seeking out fertility counseling in the future and unless absolutely
> medically indicated are still of an opinion that she would prefer not to be taking any of the
> immune modulating injections such as Betaseron, etc. as none of them are recommended
> during pregnancy.  So far, I can reassure the patient that I have no evidence on her history or
> exam to suggest an absolute requirement to recommend therapy.  We will still plan to monitor
> MRI imaging annually.  She will be making arrangements to return to Albuquerque in May,
> June or July of 2003.  She will call us ahead so that we can arrange an MRI routine and with
> gadolinium and a follow up with me sometime in the same week.

Tr. 321-322.

On January 22, 2003, Dr. Suter filed a "Memo for Record," indicating he had spoken with

Martinez.  Tr. 319-320 & 303-304 (duplicate copy).  Martinez was **still living in Las Vegas,**

**Nevada** and had called Dr. Suter.  The Memo stated:

> She has called to indicate that for the first time in quite a while, she has had an episode that
> I would agrees sounds typical for a minor, but definite multiple sclerosis exacerbation.  Her
> multiple sclerosis in the past involved optic nerve symptoms and spinal cord symptoms, but
> has been quiescent.

> Presently, she has had no recurrent symptoms of the very severe right sciatica down the right
> leg.  What she has had beginning about a week after the new year, was the fairly rapid onset

of a sense of numbness from the waist down so that it was bilateral and in no way typical for radicular disease. There was, at the same time, a sense of numbness in the left hand and arm. There was no dramatic paralysis. There was a little bit of clumsiness. There were no changes in bowel or bladder function, and things are now beginning to resolve. The relatively acute onset of symptoms and the slow resolution and the distribution would seem quite typical to me for what I presume would have been a multiple sclerosis event involving spinal cord function, not cortical or cerebellar. Clearly, the attack was not so disabling that it would meet my criteria for having her come in for IV Solu-Medrol/steroid treatment even if she lived here in Albuquerque; but, it does again raise the issue, while Annette and her significant other are still hoping to start a family, as to whether she would be better off starting on one of the immune modulating agents, probably Avonex, one shot weekly.

Tr. 319 (emphasis added).

On October 4, 2003, Martinez had an MRI done. Tr. 285-286, 281-283. The MRI results were compared with the June 29, 2002 MRI. There were no changes noted from the June 29, 2002 MRI.

On November 12, 2003, Martinez returned for her follow up with Dr. Suter. Tr. 316-318 & 300-303 (duplicate copy). Dr. Suter evaluated Martinez and diagnosed her with, *inter alia*, "multiple sclerosis– **continuing to be clinically stable with stable MRI**, 10/04/03." Tr. 316. Dr. Suter noted Martinez was taking Allegra for allergies, Fiorinal as needed for headaches, and ibuprofen 800 mg as needed. *Id.* Martinez reported she and her significant other were now living in Los Lunas, New Mexico. Dr. Suter noted:

She and her significant other continue to hope to be able to start a family and she continues to be committed to her desire to remain off of any of the immune modulating injections, such as Avonex, Betaseron, etc., as they are certainly not allowed during pregnancy, as long as possible and as long as she is stable.

Annette has had past episodes with predominantly optic nerve and spinal cord type symptomatology and has been remarkably stable for the last several years.

Her most recent MRI from October continues to show all of the appropriate abnormalities consistent with multiple sclerosis but appears to show no significant change and this is a pattern that is now held stable for about 3 to 4 years easily.

She continues to suffer from a degree of chronic fatigue.

She has not had any severe recurrence of her right L5-S1 sciatica. She has minor flare-ups of back pain which she treats with ibuprofen several times during a bad week, perhaps two weeks out of the month but certainly not daily and not even weekly and I have pushed her on this quite diligently.

She also confirms that the Fiorinal has, over the years, been her best treatment for her headaches and that she does not use it daily.

EXAMINATION: Annette presents to this visit alert and oriented times three. She appears healthy, well-developed and in no distress.

She has had no intervening, acute symptoms to suggest a multiple sclerosis attack and her neurologic exam remains stable. She has moderate imbalance when checking Romberg and tandem gait testing. She has, as always, notable hyperreflexia but no prominent spasticity and no sustained clonus at the ankles.

She has dropped forms off for Social Security/disability application to medical records and has heard nothing back. I do not have her hard copy chart her in Neurology today. Our records would indicate that it may still be in OB/GYN. She has an appointment with Dr. Shannon later this afternoon. With any luck it will be in his office. Otherwise she may have to check back with medical records directly.

I have again counseled Annette that certainly if she should have an acute episode she should contact my office. Otherwise, as long as she remains clinically stable and as long as her MRI does not show evidence for significant progression in the burden of multiple sclerosis lesions, it seems reasonable to continue to delay, implementing immune modulating therapy. Annette does still indicate an understanding and a conviction that if we were to recognize significant progressive changes on future MRI's she would definitely change her decision and lean strongly toward starting immune modulating treatment, regardless of whether she has been able to become pregnant in the interval.

I will continue to see Annette at least annually and to coordinate an annual follow-up of her brain MRI. She will contact my office for any acute changes so that we can consider steroid therapy and re-opening the discussion of immune modulating agents, if necessary.

Tr. 316-318 (emphasis added).

On December 17, 2003, Keith Rothberg, M.D., evaluated Martinez. Tr. 287-288. Dr.

Rothberg noted Martinez' vision was 20/40 in her right eye and 20/25 in her left eye. Dr.

Rothberg opined Martinez would not suffer any visual function impairment with prolonged or

occasional lifting, with detailed vision, or with irritants. *Id.* Dr. Rothberg further opined

**Martinez could see clearly enough to ambulate without self-injury, drive a motor vehicle,**

operate machinery, read small print, read large print, engage in eye-hand coordination
tasks, and identify details at close range.

On February 2, 2004, Dr. Suter submitted a Physical Capacities Evaluation.  Tr. 295-297
& 290-292 (duplicate copy).  Dr. Suter opined that, during an 8-hour day, Martinez could sit 3
hours, stand/walk 3 hours, with the need to alternate sitting and standing, had no limitations with
the use of her hands, including repetitive motion tasks, had no limitation with the use of her feet
for repetitive movements, and could occasionally lift up to 10 pounds.  Tr. 295.  Dr. Suter further
opined Martinez was not able to climb or balance but could occasionally kneel, stoop, crouch,
crawl, and reach above shoulder level.  Tr. 296.  Dr. Suter also totally restricted activities
involving unprotected heights and being around moving machinery, severely restricted exposure
to marked changes in temperature and humidity and moderately restricted driving automotive
equipment and exposure to dust, fumes, and gases.  **Finally, Dr. Suter indicated Martinez
suffered from fatigue due to multiple sclerosis which was totally disabling**.  Tr. 297.

On February 22, 2004, Dr. Suter filed a second document indicating he had first examined
Martinez in 1981 and last examined her on November 12, 2003.  Tr. 293.  **Again, Dr. Suter
opined Martinez was disabled due to multiple sclerosis**. *Id.*  **Dr. Suter noted Martinez
suffered from disabling fatigue, "significant disorganization of motor function in two
extremities," and "sustained disturbance of gross and dexterous movements, or gait and
station."** *Id.*

## B.  Listing 11.09

Martinez contends the ALJ improperly evaluated whether she met or equaled the listing
for multiple sclerosis.  Listing 11.09, requires the following:

Multiple Sclerosis.  With:
A.  Disorganization of motor function as described in 11.04B; **or**
B.  Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02;
**or**
C.  Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.

20 C.F.R. Pt. 404, Subpt.  P, App. 1, § 11.09.  Disorganization of motor function as described in

11.04B requires "[s]ignificant and persistent disorganization of motor function in two extremities,

resulting in sustained disturbance of gross and dexterous movements, or gait and station."  *Id*, §

11.04B.  Listing 11.04B references 11.00C which requires the following:

Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combination, frequently provides the sole or partial basis for decision in cases of neurological impairment.  The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers hands, and arms.

*Id.*, § 11.00C.  In his decision, the ALJ reviewed the record and found Martinez' multiple

sclerosis had not resulted in "significant and persistent disorganization of motor function in two

extremities resulting in sustained disturbance of gross and dexterous movements or gait and

station."  Tr. 17.  Substantial evidence supports this finding.  Moreover, Martinez does not

challenge this finding.  Listing 11.09B references Listing 2.02, 2.03, 2.04, and12.02.  The ALJ

found Martinez did not meet the criteria set forth in these listings and Martinez also does not

challenge this finding.  However, Martinez challenges the ALJ's finding that she did not meet the

criteria for 11.09C.  Martinez contends her "fatigue is disabling to the extent that it would prevent

her from working full-time at even a sedentary position."  Pl.'s Mem. In Supp. of Mot. to Reverse

or Remand at unnumbered pg. 10.

In his decision, the ALJ found:

> The claimant does not have significant reducible fatigue of motor function with substantial muscle weakness on repetitive activity demonstrated on physical examination and resulting in neurological dysfunction as required by Listing 11.09.

Tr. 17.  The ALJ set forth the evidence supporting his finding.  *See* Tr. 17-18.  A review of the record supports the ALJ's finding that Martinez did not meet Listing 11.09C.  On January 25, 1996, Dr. Suter evaluated Martinez and noted "complaints of fatigue all along, which can be common MS problem."  Tr. 129.  However, Dr. Suter also noted Martinez continued to work at Sandia and had "been truly symptom-free" since she saw Martinez in 1994.  *Id.*  Dr. Suter did not place any restrictions on Martinez' activities.

Then on November 12, 2003, Dr. Suter evaluated Martinez and noted she "has been remarkably stable for last several years."  Tr. 316.  On that day, Dr. Suter also noted "She continues to suffer from **a degree** of chronic fatigue."  *Id.*  However, his examination indicated Martinez appeared "healthy" and "in no distress."  *Id.*  Significantly, Dr. Suter noted "her neurologic exam remains stable."  *Id.*  On this date, Dr. Suter also supported Martinez' decision to continue with her attempts to get pregnant.  Thus, as late as 2003, the medical evidence does not support disabling fatigue.  Accordingly, the ALJ's finding that Martinez did not meet Listing 11.09 is supported by substantial evidence.

## C.  Treating Physician Opinion

Generally, the ALJ must "give controlling weight to a treating physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence in the record."  *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001).  "Even if a treating physician's opinion is not entitled to controlling weight, '[t]reating source medical opinions are still entitled to deference

and must be weighed using all of the factors  provided in [§] 404.1527.'" *Watkins v. Barnhart*,

350 F.3d 1297, 1300 (10th Cir. 2003)(quoting Social Security Ruling 96-2p, 1996 WL 374188, at

*4).  A treating physician's opinion is considered in relation to factors such as its consistency with

other evidence, the length and nature of the treatment relationship, the frequency of examination,

and the extent to which the opinion is supported by objective medical evidence.  20 C.F.R. §

404.1527(d) (1)-(6).  If the physician's opinion is "brief, conclusory and unsupported by medical

evidence," that opinion may be rejected.  *Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988).

Moreover, a treating physician's opinion that a claimant is totally disabled is not dispositive

"because final responsibility for determining the ultimate issue of disability is reserved to the

[Commissioner]."  *Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th

Cir. 1994).  However, when an ALJ decides to disregard a medical report by a claimant's

physician, he must set forth "specific, legitimate reasons" for his decision.  *Miller v. Chater*, 99

F.3d 972, 976 (10th Cir. 1996)(quoting *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987).

  In this case, Martinez  contends the ALJ "improperly substituted his own opinion for that

of the treating neurologist" and "erred in failing to give controlling weight to the opinion of [Dr.

Suter]."  Pl.'s Mem. in Supp. of Mot. to Reverse at unnumbered pg. 13.  Martinez claims the

" ALJ did not explain in his decision how Dr. Suter's records did not support his own opinion or

how they were inconsistent."  *Id.* at 14.   The Court disagrees.  The ALJ considered Dr. Suter's

opinion but found it was "not supported by the objective medical findings and [was] inconsistent

even with his own treatment records and progress notes."  Tr. 18.  The ALJ noted:

> I have also considered the opinion of the treating physician, Cary Suter, M.D., expressed in
> Exhibits 9F, 10F and 11F that the claimant's disability is of such severity as to satisfy all the
> requirements of Listing 11.09.  Social Security Regulations provide that the opinion of a

treating physician is entitled to controlling weight if it is well supported by the objective medical evidence and is not contrary to other substantial evidence in the record. <u>The opinion of Dr. Suter is not supported by the objective medical findings and is inconsistent even with his own treatment records and progress notes.</u> The most recent MRI studies performed on October 4, 2003 reveal that the claimant's condition has remained stable. There is no indication in the MRI that her disease has progressed.

<u>Although Dr. Suter states in Exhibit 9F that the claimant's impairments are of disabling severity, his most recent progress notes reveal a very different picture of the claimant's overall functioning.</u> In his progress notes dated October 20, 2001 through November 12, 2003, Dr. Suter states that the claimant's condition has been remarkably stable for several years. He did not place any restrictions on the claimant regarding working, walking, standing, sitting or lifting. The claimant wishes to postpone treatment as long as possible and he has agreed that her multiple sclerosis is stable enough to postpone aggressive treatment. If the claimant's condition was as severe as indicated in Exhibit 9F, I am certain that aggressive treatment would have been initiated long ago. Thus, while I am considering the opinion expressed in Exhibit 9F, 10F and 11F, I give greater credibility to the objective findings on MRI studies and physical examination, as they are more consistent with the claimant's overall daily functioning (SSR 96-2p).

Tr. 18-19. Thus, the ALJ set forth "specific, legitimate reasons" for his decision to disregard Dr. Suter's opinion of total disability. Additionally, substantial evidence supports the ALJ's finding that Dr. Suter's opinion was "not supported by the objective medical findings and was inconsistent even with his own treatment records and progress notes."

**D.  Medical-Vocational Guidelines (the grids)**

The grids represent the Commissioner's administrative notice of the jobs that exist in the national economy at the various functional levels (i.e. sedentary, light, medium, heavy, and very heavy). *See Channel v. Heckler,* 747 F.2d 577, 579 (10th Cir. 1984). If the ALJ's findings of fact regarding a particular individual's age, education, training, and residual functional capacity all coincide with the criteria of a particular rule on these grids, the Commissioner may conclude that jobs suitable for the claimant exist in the national economy and that the claimant therefore is not disabled. *Id.*

Because the grids classify RFC based only on exertional or physical strength limitations, they may not be fully applicable to claimants with nonexertional impairments.  See 20 C.F.R. 404.1567; *Channel v. Heckler,* 747 at 580-81.  Nonexertional impairments are medically determinable impairments that do not directly limit physical exertion, but may reduce an individual's ability to perform gainful work nonetheless.  *Id.* at 580.

Although a vocational expert (VE) should be consulted when a "claimant's residual functional capacity is diminished by both exertional and nonexertional impairments," *Hargis v. Sullivan*, 945 F.2d 1482, 1491 (10th Cir. 1991), this requirement applies only when the exertional and nonexertional impairments limit the claimant's ability to perform the full range of work within a particular exertional category, *id.* at 1490, 1492.  When an ALJ finds, based on substantial evidence, that a claimant's nonexertional impairments do not limit the range of jobs available to her, the grids may be applied conclusively.  *See, e.g., Glass v. Shalala*, 43 F.3d 1392, 1396 (10th Cir. 1994).

In his decision the ALJ found Martinez retained the RFC to perform a wide range of light work.  Specifically, the ALJ found:

> Accordingly, I find the claimant retains the residual functional capacity to perform a wide range of light work.  <u>She can perform only occasional balancing, stooping, and crouching and only occasional pushing and pulling with her lower extremities.  She should not work around heights, moving machinery or hazards and cannot perform work requiring walking on uneven surfaces.  These are primarily prophylactic restrictions.</u>
>
> This determination is consistent with the objective medical findings and opinion of the State Agency medical consultant who completed a Residual Functional Capacity Assessment (Exhibit 3F) and also found that the claimant was capable of a significant range of light work.  As the opinion of a non-examining, non-treating physician, his opinion is not entitled to controlling weight, but must be considered and weighed as that of a highly qualified physician with who is an expert in the evaluation of the medical issues in disability claims under the Social Security Act (SSR 96-6p).

** ** ** ** **

Based upon the claimant's residual functional capacity, I must determine whether the claimant can perform any of her past relevant work. The phrase "past relevant work" is defined in the Regulations at 20 C.F.R. §404.1565. The work usually must have been performed within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and meet the definition of substantial gainful activity.

The claimant has past relevant work as a production operator. Due to her physical impairment the claimant is no longer capable of performing any of her past relevant work insofar as it did involve working with machinery, tools, and electronics.

Once the claimant has established that she cannot perform her past relevant work because of her impairments, the burden shifts to the Social Security Administration to show that there are other jobs existing in significant numbers in the national economy that the claimant can perform, consistent with her residual functional capacity, age, education and work experience.

The claimant's age, education, and vocationally relevant past work experience, if any, must be viewed in conjunction with the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations, which contain a series of rules that may direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's residual functional capacity and vocational profile.

Born on April 1, 1967, the claimant is currently 37 years old.[1] This is defined in the regulations as a younger individual (20 CFR §404.1563). She has a high school education and has no transferable skills from any past relevant work. Her young age and education indicate an undisturbed capacity to adapt to other work within her residual functional capacity.

The Medical-Vocational Guidelines may be used to direct an unfavorable decision only if the claimant has the exertional residual functional capacity to perform substantially all (as defined in Social Security Ruling 83-11) of the seven primary strengths demands required by work at the given level of exertion (as defined in Social Security Ruling 83-10) and there are no nonexertional limitations. When all of the criteria of a Medical-Vocational Rule are met, the existence of occupations in the national economy is met by administrative notice.

---

[1] Although the ALJ noted Martinez was "currently 37 years old" and thus a younger individual under 20 C.F.R. §404.1563, Social Security Ruling 83-10 states:

Under Title II, a period of disability cannot begin after a worker's disability insured status has expired. When the person last met the insured status requirement before the date of adjudication, the oldest age to be considered is the person's age at the date last insured. In these situations, the person's age at the time of decisionmaking is immaterial. Soc. Sec. Ruling 83-10, 1983 WL 31252, at *8.

The Medical-Vocational Guidelines are used as a framework for the decision when the claimant cannot perform all of the exertional demands of work at a given level of exertion and/or has any nonexertional limitations. The claimant has non-exertional limitations associated with her multiple sclerosis, but is still capable of performing a wide range of light work.

Because the claimant has the exertional capacity to perform substantially all of the requirements of light work, and considering the claimant's age, education, and work experience, a finding of "not disabled" is directed by Medical-Vocational Rule 202.21, when used as a framework for decision making.

The claimant retained the residual functional capacity to perform a wide range of light work at all times prior to December 31, 2001, the date she was last insured for benefits. She was, therefore, not disabled prior to December 31, 2001 and her claim for a period of disability and disability insurance benefits must be denied.

Tr. 18-20 (emphasis added).

Martinez contends the ALJ erred in mechanically applying the grids despite the presence of significant nonexertional impairments. Martinez claims the ALJ "stated that she had nonexertional limitations, but failed to include them in his assessment." Pl.'s Mem. in Supp. of Mot. to Reverse or Remand at unnumbered pg. 18.

The ALJ found Martinez had the following nonexertional limitations; (1) could perform only occasional[2] balancing, stooping, and crouching; (2) should not work around heights, moving machinery or hazards; and (3) could not perform work requiring walking on uneven surfaces. Tr. 18. The ALJ noted in his decision that he was using the grids "as a framework" and found Martinez had "non-exertional limitations associated with her multiple sclerosis" but was "still capable of performing a wide range of light work." *Id.*

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a

---

[2] "Occasionally" means occurring from very little up to one-third of the time. Social Security Ruling 83-10, 1983 WL 31251 at *5.

job is in this category when it requires a good deal of walking or standing, or when it involves

sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered

capable of performing a full or wide range of light work, [Martinez] must have the ability to do

substantially all of these activities.  20 C.F.R. § 404.1567(b).

   Security Ruling 83-14 instructs that "[a]fter [the ALJ] decides that an impaired person can

meet the primary strength requirements of sedentary, light, or medium work– sitting, standing,

walking, lifting, carrying, pushing, and pulling– a further decision may be required as to how

much of this potential occupational base remains, considering certain limitations which the person

may also have."  Soc. Sec. Ruling 83-14, 1983 WL 31254, at *2 (emphasis added).   Social

Security Ruling 83-14 also provides examples of nonexertional restrictions that have "very little or

no effect on the unskilled **light** occupational base."  *Id.*  For example, "to perform substantially all

of the exertional requirements of most sedentary and **light jobs**, a person would not need to

crouch and would need to stoop only occasionally."  *Id.*   Thus, in this case, the ALJ correctly

concluded that because Martinez could occasionally stoop and crouch, she could perform

substantially all of the exertional requirements of most light jobs.  *See also, Hull v. Chater*, 97

F.3d 1464, 1996 WL 528317,  at **1 (10th Cir. Sept. 17, 1996)(unpublished opinion).  In

addition,  Social Security Rule 85-15 also instructs that "[a] person with a seizure disorder who is

restricted only from being on unprotected elevations and near dangerous moving machinery is an

example of someone whose environmental restriction does not have a significant effect on work

that exists at all exertional levels."  Soc. Sec. Ruling 85-15, 1985 WL 56857, at *8 (emphasis

added).  Again, the ALJ correctly concluded that, although Martinez should not work around

heights and moving machinery, nonetheless, she could  perform substantially all of the exertional

requirements of most light jobs.  *See, Hull*, 97 F.3d 1464, 1996 WL 528317, at **1.

However, restrictions on balancing and inability to walk on uneven surfaces are not among

the examples of nonexertional restrictions that have "very or little or no effect on the unskilled

light occupational base" listed in Social Security Ruling 83-14.  *But see, Hull v. Chater*, 97 F.3d

1464, 1996 WL 528317, **1 (10th Cir. Sept. 17, 1996)(unpublished opinion).[3]  Although the

record shows that Martinez' vertigo was stable shortly before December 31, 2001,[4] the date

---

[3] In *Hull*, the Tenth Circuit quoted *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992) for the proposition that "relatively few jobs in the national economy require climbing or balance." 97 F.3d 1464, 1996 WL 528317 at **1.  However, *Robinson* cited to Social Security Ruling 83-14 to support this proposition.  The Court carefully reviewed Social Security Ruling 83-14 and did not find "balance" listed as an example of a nonexertional restriction that has "very little or no effect on the unskilled light occupational base."

[4] Martinez first complained of dizziness on February 17, 1996.  Tr. 127-128.  On April 18, 1996, Dr. Grovetzian noted Martinez' dizziness was "slightly improved."  Tr. 124.  On April 19, 1996, Dr. Gorvetzian evaluated Martinez and assessed her with "persistent symptoms of dizziness and unsteadiness."  Tr. 121.  On May 9, 1996, Dr. Suter noted Martinez had "some problems with dizziness of a waxing and waning nature."  Tr. 118-119.  Dr. Suter opined that Martinez' "vague symptoms of dizziness" "often might represent anxiety."  Tr. 118.  Dr. Suter felt it important "to not be ascribing vague somatic symptoms to multiple sclerosis unless we are certain."  *Id.*  On August 7, 1996, Dr. Gorvetzian noted Martinez had been having problems with chronic dizziness and headaches.  Tr. 112-113.  Dr. Gorvetzian opined Martinez "had improved over the past few months" and recommended she return to work.  Tr. 113.  Martinez agreed with Dr. Gorvetzian that she had improved and informed him that she had been talking with the personnel department of Motorola about returning to work.  *Id.*  On October 10, 1996, Dr. Suter noted "some of her dizziness I think is as much peripheral as central but more importantly has now become a chronic problem over the last year."  Tr. 111-112.  On June 30, 1997, Dr. Suter evaluated Martinez and noted he had not seen Martinez since October 1996.  Dr. Suter noted that "subjectively [Martinez'] chronic vertigo [was] somewhat less symptomatic."  Tr. 216.  On July 31, 1997,  a speech pathologist evaluated Martinez and performed an audiogram and ENG.  The speech pathologist noted that Martinez had no nystagmus and that her ENG findings had "much improved."  Tr. 214.  On August 4, 1997, Dr. Pasqualoni evaluated Martinez and assessed her chronic vertigo as "stable."  Tr.212-213.  Martinez reported she was not taking any medications and "had not suffered any acute symptomatic episode in quite some time."  Tr. 212.  On October 19, 2001, Dr. Shannon evaluated Martinez and noted Martinez was not on any

Martinez' insured status expired, nonetheless, the ALJ did not explain how he concluded that these nonexertional impairments coupled with the exertional impairment of occasional pushing and pulling had very little or no effect on the unskilled light occupational base.

Social Security Ruling 83-14 is instructive when evaluating a combination of exertional and nonexertional impairments.   Soc. Sec. Ruling 83-14, 1983 WL 31254, at *4.  Social Security Ruling 83-14 directs the ALJ to consult a VE where nonexertional limitations or restrictions within the light work category are between restrictions that significantly diminish the occupational base for unskilled light work and restrictions that which very little or no effect on the unskilled light occupational base.  Because the ALJ failed to explain how he concluded that his restrictions on balancing and inability to walk had very little or no effect on the unskilled light occupational base, the Court finds that a remand is necessary on this issue.  On remand, the ALJ should consult a vocational expert.

However, the Court expresses no opinion as to the extent of any impairment, or whether Martinez was or was not disabled during the relevant time period (March 25, 1998 through December 31, 2001) within the meaning of the Social Security Act.  This remand simply assures that the ALJ applies the correct legal standards in reaching a decision based on the facts of the case.

---

medications for her MS and had a "very normal" gait.  Tr. 328-330.  Martinez' next visit was not until May 20, 2002.  Tr. 323-325.  At that time, Dr. Suter noted Martinez "still had problems with balance" and instructed her to return in six months.  Tr. 323.

A judgment in accordance with this Memorandum Opinion and Order will be entered.

**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**